ELLENA FOX, APPELLANT, *v.*
ABE FOX, RESPONDENT.

No. 4812

April 21, 1965 401 P.2d 53

*Foley Brothers*, of Las Vegas, for Appellant.

*Morton Galane*, of Las Vegas, for Respondent.

## OPINION

By the Court, BADT, J.:

This is the plaintiff wife's appeal "from the portion of the amended decree of divorce entered on May 13, 1964,

making disposition of the community property of the parties; and from the amount of alimony and attorneys' fees awarded, and the assessment of attorneys' fees and costs by the court."

The merits of the divorce are not in question, and the principal issue, the disposition of the community property of the parties, was, so far as the trial court was concerned, almost entirely a matter of accounting. Accordingly, the court made a reference to K. Jack Rudd, a certified public accountant, as special master.

A hearing was had by the master, a transcript of which, comprising 105 pages, is a part of the record on appeal. Prior to this, an account had been made by Messrs. Conway, Moe and Hibbs, certified public accountants, in behalf of the wife. A report was filed by the master, which, under the difficulties attending the submission of proofs, appears to be as full and complete as was possible under the circumstances. The report concerned itself mainly with determining the value of the community property of the parties. Objections to the master's report and account were filed and a further hearing had before the trial court. The appeal, as above noted, was taken by the wife from the trial court's decree adopting the master's report as to the value of the community property and to sundry other orders made by the court.

Background material must first be considered. The parties were married in April, 1935. Two children were born of this marriage, a son and daughter, both being now of legal age.

The husband and wife established "Foxy's" in Las Vegas which is a restaurant and delicatessen featuring kosher foods. The husband, as general manager with the assistance of the wife who worked as a cashier, hostess and at other odd jobs, built the business in a short length of time into a thriving enterprise. Later, both children assisted in the business, and the son at the time of the proceedings below had taken over some of the management duties of the husband.

The business of Foxy's Restaurant was operated through a holding company, Mission Enterprises, Inc.,

in which Mr. and Mrs. Fox own all the capital stock. During the marriage the husband made various investments in real estate and securities. He made it a practice to transact all business, personal and corporate, through a single bank account maintained under the name of Mission Enterprises, Inc. In other words, all money received was deposited in this bank account whether it was the profits of Foxy's, money derived from real estate transactions, or personal loans to Mr. Fox. All payments on real estate, all repayment of loans and all money loaned were paid out of this account. All the property of Mission Enterprises, Inc., is admitted to be community property.

Mrs. Fox commenced her action in April, 1962, as one for separate maintenance and the parties separated about this time. The husband answered and counterclaimed for divorce. The wife replied to the counterclaim and subsequently amended her complaint to ask for an absolute divorce. Mrs. Fox, after commencing the action, employed the certified public account firm of Conway, Moe and Hibbs to examine all books and records and obtain any information available. This firm analyzed the books and records of Mission Enterprises, Inc., through which Mr. Fox conducted the restaurant business and all other transactions, and made a report dated January 15, 1963, which is not contained in our record.[1] The period covered by this report was January, 1962, through November 30, 1962. It was generally agreed that the year 1962 would be used to determine the extent and nature of community property and the value of Foxy's Restaurant. No claim is made of any failure on the part of respondent to cooperate in presenting all available material that would throw any light upon the value of the community property, nor is his credibility attacked in any respect. The main criticism leveled against him is his failure to keep accurate accounts of the sources of the money deposited in the one general

[1]The Conway, Moe and Hibbs report of January 15, 1963, and their subsequent report of July 3, 1963, more fully appeared from the treatment of such reports in the master's report filed July 12, 1963, and his supplementary report of July 30, 1963.

banking account of Mission Enterprises, Inc., which conducted the business of Foxy's Restaurant, to identify such deposits. The only record kept of the sources of such deposits was on the deposit slips. Some of these had been lost in the confusion attending the reconstruction of the premises. No accusation of a deliberate destruction of these records is leveled at the respondent.

The importance of determining the source of the deposits lies in the fact that if the deposits of undetermined source came from the profits of the restaurant, they would, under accepted formulas, substantially increase the value of the goodwill of the business.

During the proceedings before the district judge, Mr. Conway testified concerning the above report made by his firm. He stated that the deposits in the bank account of Mission Enterprises, Inc., exceeded recorded receipts from business purposes less recorded cash expenses for business purposes in the amount of $312,764. He further testified that expenditures in the amount of $142,367 were made by check, recorded as non-business expenditures, and charged to the ledger account of Notes Payable, Abe Fox. Another $212,717 was expended by checks for non-business purposes which were charged to an account in the general ledger entitled, Cash Clearing. The wife's counsel then asked Mr. Conway if he was able to identify the source of bank deposits which totaled $312,764. Mr. Conway replied that: "None of the bank deposits as such were identified in detail as to their source. The $312,764 stated here is merely an arithmetical computation of the total bank deposits less the recorded figure of available cash for bank deposits from business sources." The husband's counsel, in cross-examining Mr. Conway, stated the question involved when he was asking a question. "Then the real problem is for you to find out what a particular entry under the general clearing account meant in terms of the source from where Mr. Fox got the money?"

Mr. Rudd, the appointed master, reviewed the books and records of Mission Enterprises, Inc., as Conway, Moe and Hibbs had done before making their report.

Mr. Rudd made his report which contained an evaluation of the real property of the parties, the securities and the business of Foxy's Restaurant.

At the hearing before the master, counsel for Mrs. Fox examined Mr. Fox as to the source of these non-business deposits. Mr. Fox testified that the deposit slips that would have identified these deposits were lost, misplaced or destroyed during remodeling of the restaurant. He stated that many of these unidentified deposits were from cash exchanges; that is, he had previously loaned money to another and the deposit was the repayment of this loan. An example of such a transaction is Mr. Fox's dealings with Mr. Bershin. Mr. Fox testified that Bershin loaned him $10,000 in 1962 and that this sum was subsequently paid back. However, Mr. Fox could not remember why this $10,000 was borrowed or the date of such transaction. Mr. Fox simply stated that this transaction was "just personal, just cash exchange. I loaned him, he loaned me." Mr. Fox then went on to identify much of the previously unidentified non-business deposits in the same manner.

After the hearing before the master, Conway, Moe and Hibbs made another report analyzing the non-business deposits and disbursements in light of the master's report and the hearing before the master. Part of this report is as follows:

"From the foregoing it is determined that for the year 1962 total deposits in the corporate bank account exceeded deposits from known business sources in the amount of $336,616.88.

"It is pointed out again that the analysis and identification of the disbursements does not in any way specifically identify the excess deposits. There is no detailed record available to our knowledge that will specifically designate or describe the daily deposits. They are usually made in round amounts of hundreds or thousands of dollars without any specific correlation to the daily receipts of the business. Mr. Fox and his representatives have made representations to the effect that these excess deposits were derived in part from third party deposits

later identified on the disbursement thereof under the 'Cash Exchange' category referred to above. If we accept this rather broad assumption, we still come to the following conclusion:

> "Total deposits in excess of those iden-
> tified as from business sources_____ $336,616.88
> "Less: 'Cash exchange' disbursements $212,910.51
>
> "Balance still unidentified_____ $123,706.37"

Mr. Conway felt that since $123,706.37 was not identified as to source, it could easily be attributed to additional profits from Foxy's. And this additional increase would greatly increase goodwill though the master did not consider this unidentified amount as business receipts.

Mr. Rudd then made a supplemental report wherein he directed his attention to Conway's claim that $123,-706.37 should be attributed to business sources, and concluded that this amount "should not be considered in evaluating the goodwill on the books of Mission Enterprises, Inc." This report further stated that "the Conway, Moe and Hibbs report does not show how these unidentified receipts are related to the business of Mission Enterprises, Inc., which operates Foxy's Restaurant." The above conclusion is supported by the fact that the sales on the books of Foxy's for 1962 were the same as the sales reported to the Nevada Tax Commission for the same period. And since the sales of Foxy's were reported to the Nevada Tax Commission by a reliable accounting firm, the master rejected the possibility that any of the unidentified receipts were business income even though Mr. Fox had not identified the source of such deposits.

In its decision the court adopted the master's report and findings in total and held that "the explanation by the defendant as to his financial transactions is a reasonable explanation, not unusual in the growth of a business that was originally undercapitalized."

The contentions of appellant's counsel, supported by appellant's accountants, are in all respects but one[2] in

---

[2]But see other points raised as hereinbelow discussed.

substantial accordance with the contentions of respondent's counsel, the master appointed by the court, and the court's conclusions. This one exception is the disposition or allocation of the item of $123,706.37, being the item generally referred to as the one whose source is unidentified. As above noted, appellant urges that it should be allocated to additional profits from Foxy's Restaurant. Appellant insists that this is not a question of exercise of discretion by the trial court but a case in which the trial court was required to find under the law that it must be allocated to such business profits by reason of the failure of respondent to keep books and records definitely showing that it had a different source, such as being a part of his numerous real estate transactions or part of his constant practice of borrowings and lendings referred to generally as "cash exchanges." It is especially emphasized that Fox not only failed to keep books of account that would identify the source of deposits in the general account, but in an extensive cross-examination he was unable to identify the source of any part of said sum of $123,706.37.

[Headnote 1]

The precise legal issue is this. When a court is faced with a problem of finding the value of a community business, must the husband as manager of the community assume the burden of satisfying the court that moneys deposited in the community account during the course of the accounting year were received from sources other than the community business. We have referred to the statutory vesting in the husband of complete control of the community business. Fairness demands that such control carry with it the burden of explanation, particularly in a case like the present where an evaluation must be made of a community business. Where large sums of money find their way into the community bank account and are claimed by the husband to have their source in transactions other than the particular community business, his is the duty of explanation and proof. The master refused to consider the unidentified deposits of $123,706.37 as receipts from Foxy's and therefore evaluated the goodwill of Foxy's

Restaurant at $50,000. He reasoned that if these unidentified deposits were not shown to be attributable to the business of Foxy's Restaurant, he was justified in excluding it. But this treatment ignored the legal requirement that the burden of explanation was upon the husband; and the lower court fell into error by adopting the master's recommendation in this regard.

This court in Ormachea v. Ormachea, 67 Nev. 273, 217 P.2d 355, said: "Apparently no attempt was made by him to keep the separate and community property segregated, and that now makes it impossible to determine what is community and what is separate property. The rule under such circumstances is that such intermingled properties are considered community properties, and we apprehend the basis of this rule to be that the properties have become so mixed and *intermingled that it is no longer possible to determine their source.* It is the duty of the husband, as the manager of the community property, to keep the community and separate property segregated. Barrett v. Franke, 46 Nev. 170, 208 P. 435." (Emphasis supplied.) Although that case is not completely in point, involving as it does the intermingling of community property with separate property of the husband, the analogy of Ormachea becomes complete when, as here, the husband intermingled moneys of outside transactions with moneys resulting from the profits of the operation of Foxy's Restaurant, and when the court approved the husband's casual management of the community by refusing to consider the unidentified deposits of $123,706.37 as receipts from Foxy's in computing the restaurant's goodwill. This conclusion is strengthened by the provisions of our statute placing complete control of the community property in the hands of the husband (NRS 123.230). And it is not uncommon to put the burden on the husband to prove something he claims when it involves community property which he controlled and managed. See Spector v. Spector, 94 Ariz. 175, 382 P.2d 659; Uchello v. Uchello, 220 La. 1061, 58 So.2d 385; Sciambra v. Sciambra, 153 So.2d 441 (La.App.

1963) ; Beatty v. Vining, 147 So.2d 37 (La.App. 1962). It is further supported by the fact that in such management of the community property his position is that of a trustee for the wife's share analogous to the trustee relationship of a partner to his partnership or an agent to his principal. Jorgensen v. Jorgensen, 32 Cal.2d 13, 193 P.2d 728; Fields v. Michael, 91 Cal.App.2d 443, 205 P.2d 402; Spector v. Spector, supra. The propriety of adopting the conclusion of a trusteeship is strengthened by the fact that the parties separated in April, 1962. The year in which the value of Foxy's Restaurant is questioned was the year 1962, and the duty of the husband to keep accounts was challenged at the time of the separation in the spring of that year when Mrs. Fox's action was commenced.

The result of our view is that a goodwill value for Foxy's Restaurant must be fixed not in the sum of $50,000 as recommended by the master and adopted by the trial court, but in some sum in excess thereof resulting from the addition of the $123,706.37 to the 1962 business receipts.

It is not the province of this court to fix the value of such goodwill or to apply any particular formula for the purpose. This is the function of the trial court resulting from the facts adduced and the expert testimony of accountants or other experts in the field of business and finance.

We then approach the division of the community property as made by the court, and also the matter of its allowance of alimony. This is controlled by the provisions of subsections 1 and 2 of NRS 125.150, reading as follows:

"1. In granting a divorce, the court may award such alimony to the wife and shall make such disposition of the community property of the parties as shall appear just and equitable, having regard to the respective merits of the parties and to the condition in which they will be left by such divorce, and to the party through

whom the property was acquired, and to the burdens, if any, imposed upon it, for the benefit of the children.

"2. Whether or not application for suit money has been made under the provisions of NRS 125.040, the court may award a reasonable attorney's fee to either party to an action for divorce if attorneys' fees are in issue under the pleadings."

The court was not compelled to make an exact equal distribution to the parties of either the community property itself or the value thereof. Yet the court appears to have directed its purpose to that end in what to it seemed a realistic manner. It first found the value of the community property comprising the restaurant business, including goodwill, at $50,000, and sundry parcels of real estate (subject to certain obligations) and securities. These properties it distributed to the husband but allotted to the wife one-half of the determined value thereof, plus 10% of such value to compensate for or equalize the anticipated appreciation of the value of the properties allotted to the husband, pursuant to the court's opinion that the wife had not the training, experience, or ability to build up an estate of her own. The figure thus arrived at for payment to the wife was the sum of $96,078.75. The court made such payments secure through certain deposits in escrow, through insurance on the husband's life and further provided for the furnishing of an automobile to the wife by the husband. It also distributed to the wife the household furnishings, furniture and appliances as her sole property. However, the court provided that the sum thus payable to the wife should be paid $5,000 in cash within 30 days from the date of filing of the decree and the balance, plus interest at 3% per annum, at the rate of $1,000 per month.

These provisions must be analyzed in light of the fact that the court had theretofore ordered temporary alimony for the wife in the sum of $800 a month in accordance with proofs submitted as to her necessities, and the further fact that the court allowed permanent alimony in the sum of $100 per annum. If, then, the wife

had available $1,000 a month plus one-twelfth of the $100 annual alimony, she would have available $1,008.33, from which she would have to expend as living expenses $800 per month, leaving $208.33 for investment. Such entire sum (subject to some variation by reason of the $5,000 down payment and by reason of the accrual of 3% interest allowed by the court) would exhaust her entire allotment of community property in approximately nine years. During this period she would accumulate, at the rate of $208.33 a month, the additional sum of about $22,500. The 3% interest allowed would provide $2,732.36 at the beginning of the payments (following the $5,000 down payment);[3] with diminishing interest thereafter as the monthly payments were made. In connection with this discussion, it should be remembered that the court reserved jurisdiction to modify the allotments to the wife. There should also be taken into consideration the fact that the parties had been married for 29 years and that the divorce had been granted to the wife by reason of the fault of the husband—mental cruelty. We also have in mind the fact that the court had originally allowed no alimony at all, but later modified its decree to allow $100 per year on the wife's motion to modify the decree. While we have not lost sight of the husband's lucrative business as demonstrated by his receipts for the year 1962, we must credit the trial court with having in mind first that 1962 was a year of great economic expansion in Las Vegas and also that the restaurant business in that city is a highly competitive business and must face possible accompanying hazards.

All in all, it is apparent that the trial court worked out its decree after careful consideration of all elements and, although we would have been disposed to make a higher allowance of alimony had we been the triers of fact, we are disinclined to hold that the meager amount of alimony allowed was a breach of discretion in view

---

[3]Appellant concedes that the wife would receive as interest the first year "3% of $91,078.75, * * * or the sum of $3,632.34."

of the other provisions made for division of the community property, except for the matter of evaluating the goodwill of Foxy's Restaurant after proper allocation of the 1962 receipts of $123,706.37.

The court must have considered the effect of drawing out of the business not only the $1,000 monthly payments provided for but an additional sum of $800 a month alimony as insisted upon by counsel for the wife. The payment of any moneys at all to the wife depends upon the successful maintenance of Foxy's Restaurant. The destruction of that business by the withdrawal of an unreasonable monthly sum would afford no benefit to either party. Apparently the trial court was trying to avoid such possibility. The court's order reserving jurisdiction to modify the decree with regard to payments to the wife was an indication that favorable consideration should be given to a motion for modification if future circumstances warrant it.

Costs of the litigation included payments as follows: Thomas Taney, $500; Nelson Conway, $2,783; Rudd and Rudd, $4,248; Foley Brothers, $5,500; Morton Galane, $5,500: Total $18,531. The court ordered these sums paid out of the community property before the division thereof. We find no abuse of discretion in such action.

Appellant also complains that the $5,500 attorney's fees awarded to the wife, in addition to the original preliminary $500 fee, was entirely inadequate to pay for the services of the wife's counsel. This also was largely in the discretion of the trial court, and we are not inclined to say that the fee allowed was inadequate.

Appellant also contends that additional fees should have been allowed on her appeal. No necessity for this appears.

It follows from what has been said that the judgment must be affirmed in all respects except for the fixing of the value of Foxy's Restaurant which must include a value of the goodwill as affected by 1962 business

receipts in the sum of $123,706.37. On such issue the judgment is reversed and the case remanded for a limited new trial for the purpose of taking the said sum (or such sum as may result from said limited new trial) into account as the receipts of Foxy's Restaurant for 1962. In remanding for such purpose this court has in mind the discretion vested in the trial court, both in respect to a division of the community property pursuant to NRS 125.150, and also with reference to the award of alimony. That the award, as heretofore made by the court for a division of the community property, may well be affected by the result of this opinion was recognized in Weeks v. Weeks, 72 Nev. 268, 302 P.2d 750.

Reversed and remanded for a limited new trial in accordance with the views herein expressed.

THOMPSON, J., and BARRETT, D. J., concur.

MCNAMEE, C. J., being unable to act by reason of his hospitalization, the Governor commissioned Honorable John W. Barrett, Judge of the Second Judicial District, to sit in his place.